We'll hear argument first this morning in Case 12-99, Unite Here Local 355 v. Mulhall. Mr. McCracken. Mr. Chief Justice, and may it please the Court, many employers and unions find agreements such as this useful to avoid conflict during organizing campaigns. They are efficient, they avoid the hard feelings that come in many contested organizing campaigns, and thereby create a good environment for collective bargaining. They serve the core objectives of the Labor Management Relations Act, those being freedom of contract, organizing employees for collective bargaining, and labor peace. I think there's substantial force to that argument. But can we talk just about property for a minute, just in the abstract? Isn't it true that what you have might become property when you trade it? If you take a picture of a celebrity on the street, that's your right to do so, but you can't sell it. Maybe that's not quite the right analogy. But here what, as you point out, is fairly standard in labor relations has been turned into property, arguably, by the parties. Could the parties say that we'll pay you, could the employer say we'll pay you $100,000 to get out of the recognition agreement? That would be property in an economist's sense. Now, it might be a violation of the Labor Act. That example would definitely be a violation of section 302. If the employer gave the union $100,000 to not organize, that would be exactly like the Ventimiglia case from 1957 in the Fourth Circuit. But in the abstract, wouldn't that be property? Money is property. We don't dispute that. Isn't the thing that's exchanged for the money also property? This statute focuses on what is paid, lent, or delivered by the employer. I'm just talking about our common definition, our common agreement as to what property means. In this case, the only thing given by the union was a promise not to strike, picket or boycott this business, to help supply labor if the employer needed it, not to coerce or threaten employees in the course of the organizing effort, and to arbitrate in the event that there was any dispute. And the list, the list of employees. Yes. That's what the employer promised to give to the union. And I was describing the things the union gave in response, because it was a mutual agreement. What about support of the legislation to permit slot machines? Was that a promise that the union made? It's so alleged, and there's no question that the union did tell the employer and the other employers that it would work to pass the legislation necessary for these employers to get into business in the first place, thereby serving their interest and also the union's interest in having an industry and workers in the industry to represent. But as the case comes to us, we assume that there was such a commitment by the union. Yes, Your Honor. So suppose the company manufactures widgets and the union says, we'll spend $100,000 advertising your widgets if you sign the recognition agreement. Yes. I think that the union would not have received any widgets. It would not have received any kind of property from the employer. It would simply have promised to help the employer in business, something that happens a great deal in labor relations. Well, there would have been a quid pro quo for that, certainly. I mean, the union wouldn't promise that for nothing. It would get something in exchange, such as, as in this case, the right to go on the employer's property to recruit union members or some other thing of value from the employer. Right? Unquestionably. And this, as I say, happens a lot in labor relations. So why isn't that the property that Justice Kennedy referred to? The union paid $100,000 to get the items that the employer gave them. So aren't they valued, something tangible, valued for what the union paid for? They are desired by the union. That does not make them things of value that are paid, lent, and delivered by the union. Well, why? Well, the argument, as Justice Scalia and Kennedy are referring to it, is that the employer paid with the employee list, the access to the facility, the promises not to strike, to get the $100,000. And that was the essence of the union paying money is not a violation of the Act. There is no prohibition against the union paying money to an employer. Right. It's only the other way around. And in this case, the union spent $100,000 of time of its staff knocking on doors, exercising its speech and petition rights in order to get this legislation passed so that the employer could get into business. Mr. McCracken, the Respondent's brief here asserts that these kinds of precertification agreements have only been common since the 90s. Is that accurate to you? It is not, Justice Scalia. There is an article from the Cornell Industrial Labor Relations Department by Eaton and Kresge showing that these agreements go back to the 1970s. Also, in the Sixth Circuit's Dana Corporation case, you will see that there is an explanation that the neutrality agreement between Dana and the UAW was first signed in 1976. So these go back quite a bit further. Also, they really go back in a rudimentary way, much further than that, to the Lyon Dry Goods case, which was an agreement with a non-incumbent union and department store employers in Cleveland that provided, among other things, for access. Sometimes there is a conflict between two different groups that want to unionize the same workforce, right? Yes. How would this work in that case? Let's say the employer gave the — entered in an agreement like this with one union that wanted to organize the same workforce, but not the other. The NLRB has dealt with that quite a few times and takes the position and has required employers to give equal rights to both unions. Doesn't that suggest it's a thing of value in this context? It's certainly not a thing of value in the sense of marketability, because one union could not sell it to the second union because the other union could get it free from the employer, because the employer must give equal rights to all comers. In the typical case, how important is an agreement like this to the union? How much does it increase the likelihood that the union will be selected as the exclusive bargaining representative? The same article that I mentioned, Justice Kagan, shows that the differential is between about 67 percent success rate in NLRB elections and about a 76 percent success rate under these agreements. Are the agreements uniform or do they have varying elements? There are some things that are quite standard. Is the card check provision standard? It is found in most agreements. Neutrality, somewhat less so, but still in the vast majority of them. Kennedy, I don't think this is slightly different from Justice Kagan's question. Can you give us some indication of how often employers make these agreements? It's probably a hard statistic to collect because there are so many variables. Yes. But I can tell you from my experience, if I may, that these agreements are prevalent in the hospitality industry. And both in hotels and casinos. And that all of the major hotel companies have entered into these and the major casino companies as well. Ms. McCracken, could you tell us about this particular contract? Because as far as I can fathom from what we have, it expired at least a year ago and there was no recognition. There was no election, is that right? Yes, that's correct. So are we dealing with a live case, considering that the agreement has expired? Justice Ginsburg, the complaint in this case prays for two different forms of relief. One is that the provisions of this agreement not be honored. But the second is that the union never demand or request or receive any of these things, that is, neutrality, names and addresses, or access, regardless of an agreement. So what would be the relief? The relief, if this case went forward and was found meritorious, the relief would be an injunction against the union from ever asking an employer, this employer, for neutrality, or for the names and addresses of employees, or for any form of access to the premises. And not the theory that it did it once, so it might do it again, is that it? I believe that the theory that the plaintiff has here is that an employer may never give these things, whether it's an agreement or not an agreement, that even if the plaintiff asks for the names and addresses of employees, it would be an injunction against the union from ever asking for the names and addresses of employees. Would Mr. Mulhall have to face an imminent threat in order for him to have standing? He would, Your Honor. And why is the threat imminent at this time? I'm sorry? Why is the threat imminent at this time? Your Honor, we advocated during an earlier phase of this case that there was no standing. What is your position now? We still do not believe that he has standing, because there is no imminent harm here. The harm that he alleges is that he will be ultimately forced into a collective bargaining situation that he doesn't want. However, that could only occur if the union succeeded in convincing a majority of his co-employees that they should unionize and the employer gave recognition and the collective bargaining agreement was negotiated. Only after so the imminence is very distant here. Did you also raise at an earlier stage an argument that he had no private right of action? We did not. That has never been litigated? It hasn't. It has been litigated. It's a point that's been raised and rejected by all the courts to consider it, largely because of the court's, this Court's statement in Atkinson v. Sinclair refining. Now, it was dictum, but it has been, it's something that has been accepted by all the courts. But not in this case. It wasn't raised in this case. It was not raised in this case. Instead, standing was raised. And Sinclair is of a certain age before this Court looked more carefully at the implication of private rights of action. That's true, Justice Ginsburg. But the court in the Demise case in 1993, involving whether trust funds could be administered by the judiciary, essentially, under Section 302e, assumed the existence of a private right of action. The court decided that it was not proper for the courts to get past the point of formation of the trust and engage in trust fund administration. But it was assumed that the plaintiff had a right to sue. Alito, why wouldn't the right to use private property in a way that otherwise wouldn't be allowed constitute a thing of value? Suppose the employer gave the union was a lease well below market rate on property for use as the union office. Would that qualify as a thing of value? It would qualify both as a thing of value and one that is paid, lent, or delivered by the employer to the union. So what's the difference here? There's the use of, there's the conveyance of a certain property right? Why doesn't that constitute a thing of value? Because the union really only had a right of access, not any exclusive possession of any property, and only for the very limited purpose of communicating with employees about their Section 7 rights. But it's still, it's a lesser property right, but isn't it a property right? What if the employer sold to a catering company the right to drive lunch trucks onto its premises to sell sandwiches and coffee to the employees? Wouldn't that be a property right? Not under Florida law, Your Honor, because it would only, it would at most be a license. No interest in real property would be considered. All right. Well, isn't a license a thing of value? A license may be a thing of value that is paid, lent, or delivered. In this case, there was not a license so much as there was a waiver or forbearance of the employer's right to exclude. The union did not receive or accept any employer property. It did not. Kennedy, that's true of all property owners. I have a right to waive my right to exclude you from the property. That's property, that's a property right. And it can become so when I charge for it. Yes. It is your property right, but the union did not obtain your right to exclude. It did not obtain that property right. It obtained the right to be there, to not to any exclusive area, but your property right to exclude remained in your hands. Counsel, it's clear that there's some difficulty in defining the limits of property. There are some things that I think have value, even though they may not have market value, for example, an employer bribing a union steward by offering him a favorable work schedule or days off that are a weekend or something that's valuable to the worker but doesn't necessarily have an objective value. The government cites Credit Suisse v. Billing in its brief. When you get up on rebuttal, I want to talk to you about the law that has been developed that in that case and why it doesn't apply here. Yes. Thank you, Your Honor. Thank you, counsel. May I reserve my remaining time? Yes. Thank you very much. Mr. Dreeben. Mr. Chief Justice, and may it please the Court. Section 302 cannot be read in isolation from the remainder of the labor laws. The United States does not dispute that if all this Court had to look at was the words thing of value in section 302, the promises that were at issue in this case could be viewed as things of value, and with a little bit of stretching of the language, could be viewed as paid, lent, or delivered. Before you get too much into the merits, does the United States have a position on whether this case satisfies Article III? We don't, Justice Alito. The Eleventh Circuit did hold that Mulhall had standing, and we raised a question of whether the case is moot at the certiorari stage as a reason why this Court may not want to take the case, but we have not drilled deeply enough into it to have a position on that question. Does the United States have a position on the implication of a private right of action under 302? Dreeben, it seems to have been accepted historically, and as my co-counsel mentioned, it was referenced in dictum by this Court. It's been accepted by the lower courts. I think if this Court were looking at the language of the statute today, section 10e of the 302e of the statute, which is on page 11a of our brief, gives the district court's jurisdiction to hear violations of this case, of the statute, and it would And courts have assumed that private parties could invoke that. If the Court were looking at that afresh, I'm not sure that it would reach that result, but there is a lot of ink on the page with respect to it. The Eleventh Circuit did not reach that issue, and it doesn't seem to be squarely presented here. But what is squarely presented here is whether the Court should read section 302 as a freestanding provision divorced from the central policy of the labor laws and the labor laws. Now, as Justice Sotomayor Kennedy, are you saying that thing of value means something different in 302 than it means elsewhere in the code? I can see if there was a conspiracy to extort these benefits, that the government would take the position that there was a crime because there was a thing of value, a thing of property. Well, under this statute, the government's position is that the three terms that are at issue, neutrality, access, and employee list, are not prohibited by section 302. Probably the best way to reach that conclusion is to determine that Congress did not intend that these three things be viewed as things of value under the statute. Certainly read in isolation, the words thing of value are very broad. In other statutes, they cover intangibles. We would have no problem treating the things here as things of value under statutes or under 302 if that's the only thing that existed. Isn't billing your best argument, the framework of billing? Yes, I think it is, Justice Sotomayor. What the Court has to do here, as it did in the billing case, is read multiple statutes together in order to harmonize them. And just as in billing, the Court said, well, the antitrust laws literally do apply here. The securities underwriting activity could violate antitrust laws. The Court looked at it in light of other policies reflected in the securities laws and determined that Congress, having established an intricate framework for regulation of the very same activity in the securities laws, would not have intended the antitrust laws to come along and supplant it. And here, what you have are — Some people have suggested that billings is limited to the antitrust area. And how do you respond to that belief, and how do you convince us to expand the doctrine outside its traditional context? Billing is simply an application of this Court's responsibility to divine Congress's intent based on language, structure, and history and policy of the relevant laws. And here, all of those things, when read together, indicate that agreements by parties to set the ground rules for an organizing campaign do not constitute prohibited. Breyer, but what is the — suppose that the employer had written a check for $100,000 to the union and everything else is the same. Now, you ask why did he do that. He said because they have to have the money so that they can run the organizing campaign along the lines that everyone wants. Is that covered or not? Yes. That would be a violation. So then when I write the opinion that says that is covered, but the access, the employer lists, and the neutrality, those are not covered because. $100,000 is, but they aren't because, and then what comes after the because? Two things, Justice Breyer, and they are both equally important. First of all, the provision of money is useful to the union in any number of ways and gives rise to the dangers of misuse. No, no. We specify how they are going to use it. They are going to use it just the way that it should be. It can't be restricted in that way because the origins of Section 302 came from. Okay. Okay. Continue with the because. One, because money might go beyond. Okay. What's the other? The other is that reading the policies of the Act as a whole, we start from the proposition which is undisputed by Respondent and reveals that his purportedly literal application of Section 302 just does not wash. We start from the proposition that voluntary recognition of a union is not only permissible under the National Labor Relations Act, it's a favored element of national labor policy. The voluntary reconciliation of agreement of disputes between labor and management is what this Act drives at. Well, if, if, if I could just finish this one point, Mr. Chief Justice, as an answer to Justice Breyer's question. The three procedures that are at issue here are all procedures that are useful and geared towards facilitating voluntary recognition and are only useful for that purpose. If I may? Thank you. But if you recall what the point you made earlier, the point is, yes, voluntary agreement, but if a majority of the workforce wants to be organized and represented by that union. And the argument here, as I understand it, is that this agreement taints that process, in particular by allowing the card check procedure that, it has been argued, exercises coercion against employees to support the union. Well, this Court in the Gisselt-Packin case many years ago rejected that argument. The National Labor Relations Board has rejected that argument. Certainly, the card check agreements are inherently coercive, yes. If that has been rejected. Well, will you concede that they're more coercive than a secret ballot? I don't think they're coercive at all, inherently. They may be. The union organizer comes up to you and says, well, here's a card. You can check, I want to join the union, or, two, I don't want a union. Which will it be? And there's a bunch of your fellow workers gathered around as you fill out the card. Well, some would argue. He's a big guy. Some would argue that employers also have big guys, and it's very coercive to have your employer in there on the factory floor reminding employees daily that they're very anti-union and that there are a lot of costs to joining a union. And so the process here is one in which, yes, the parties can go to the National Labor Relations Board and have an election. But this Court in the Gisselt-Packin case, backed up by decades of board law, has validated that card check agreements are perfectly legitimate and may facilitate the employees' free exercise of their choice to have a union. The agreement in this case doesn't recognize the union. All the agreement does is establish a perfectly lawful process, which Respondent concedes would be a thing of value, but he then has to carve it out from Section 302, a voluntary recognition agreement. And the access that is given to the property, which is something that employers lawfully can do, it's their property, they have the right to do it, they provide it so that the employees can get information from the union about unionization, and the employee list serves the same thing. And these things, access, employee list, neutrality, have been elements of Federal labor policy for decades. Ginsburg. One curious thing about the Eleventh Circuit's opinion is it didn't reject. It's a curious opinion, and we are at an interlocutory stage, but the opinion reads employers and unions may set ground rules for an organizing campaign, even if the employer and union benefit from the agreement. So the Eleventh Circuit seemed to agree that these agreements are enforceable, but it said it can become illegal if used in a scheme to corrupt. All of the courts of appeals, Justice Ginsburg, have concluded that ground rules agreements are inherently lawful. The Eleventh Circuit added a motive-based limitation on it that responded to a policy that's just not reflected in the language of the Act. Scalia. What about slot machines? You mentioned all of the other things promised, but not the promise to support legislation? That's right. The union's promises are not comprehended by Section 302. All that's at issue here is whether it's a Federal crime for an employer to say to a union, you guys want to organize? I will let you come into my plant and address the employees. In fact, better yet, we will have a debate. Management on one side, union on the other. Come into our hall to do that. That would be a Federal crime under Respondent's view. Thank you. Thank you, counsel. Mr. Messenger. Mr. Chief Justice, and may it please the Court. Enforcing Section 302 in this case cannot conflict with the National Labor Relations Act. As Unite admits, organizing agreements such as this are meant to privatize the National Labor Relations Act and avoid the representational procedures. The agreement here expressly requires that the employer not petition for a secret ballot election, not file unfair labor practices with the National Labor Relations Board, and also provide assistance to the employer or to the union that it has to go Mr. Messenger, you're dealing with a decision that seems to uphold organizing agreements. I just read the passage, and it's all that it's saying is find out if in this case there was some corruption involved. But it does say employers and unions may set ground rules, even if the employer and the union benefit from the agreement. So you seem to be construing the Eleventh Circuit decision to say something it didn't say, to say that organizing agreements violate 302. Well, I would say two things. First, the issue, of course, are the three individual provisions, not organizing agreements as a whole. The three things at issue here, of course, is the gag clause, the use of property and the information, not the agreement. But secondly, the Eleventh Circuit's opinion comes from its holding that this intangible assistance can't be delivered, it can only be paid. And therefore, the Court held you needed to show consideration for payment. Where is that? It's at the Eleventh Circuit's opinion, right above the section that you just read from, where the Court held that it didn't believe that things could be delivered, which we disagree with, but that they can be paid. And therefore, if consideration is given, then you have a violation. And then it goes on to say that consideration would show that the purposes of the statute are implicated by the transaction, because in that case the union is being influenced by what the employer gave. So the Eleventh Circuit, when it said that not all ground rules agreements will violate 302, is saying that if no consideration was given, there would be no payment and therefore no violation in that case. Ginsburg. It says that, at the end of that passage, curbing bribery and extortion are implicated. Yes. And so that's what? If there is consideration. So if the employer gives this assistance and the union gives something in return, for example, here, the $100,000 political campaign, an agreement not to strike, then it becomes a payment because the consideration shows payment. What is your position on the effect of the expiration of this agreement? I don't believe that it renders the case moot for two reasons. The first of which is that Unite has pending a lawsuit to compel arbitration in which it is alleging violations of the agreement that occurred before it expired. And one of the remedies the union is seeking is to have the agreement extended for a longer period of time, which was a remedy it received before. And that lawsuit is currently pending in Federal district court. It's been stayed pending these proceedings. And then the second reason is Unite continues to demand this organizing assistance. 302b1 makes it illegal for a union to demand a thing of value, even if it doesn't receive it. Unite here is clearly still demanding that Mardi Gras help it organize its employees, so Mulhall still has standing to seek injunctive relief to stop the union from demanding those things. Mr. Messenger, could all of these things that the employer gave to the union be included in a finally negotiated collective bargaining agreement? Couldn't that CBA say that the union shall have the ability to approach employees on the site, that the union shall have access to the employee list of the employer? And what else? What's the third? And that the employer will not seek to undermine the union. Could all of that be included in a CBA? The first two could, because the exceptions to 302 start to apply, the exceptions found at 302c. For example, access for union stewards has been upheld under Section C-1, which allows for access to union officials if by reason of their service to the employer. And so giving a union steward use of property to administer the contract and such has been upheld. That case is BASF-Winacott v. 1, BASF-Winacott. The information, during collective bargaining, a union has a right to information under Section 8b-5 of the National Labor Relations Act. Giving that information would fall under the exception found at C-2, which provides for the release of any claim that a union may have. And so the union has a legal claim to that information under the NLRA. So if the employer agreed to provide it or did provide it, it would fall under that exception. Kagan. Mr. Messenger, do I understand the structure of your argument to be as follows, that whether before certification or afterwards in a collective bargaining agreement, along the lines that Justice Scalia said, the only thing that an employer can promise a union or agree to provide to a union are things that are specifically authorized in other parts of the labor law. Is that the structure of your argument? Messenger. Yes, Your Honor. And because in collective bargaining, a union, of course, is supposed to act as an employee representative and not for itself. So most terms of collective bargaining agreements go to the employees, not to the employees. And so I think that's the structure of your argument, Justice Scalia, that the 302's whole purpose, or primary purpose, is precisely to prevent such help. Kagan. Kagan. See, I would have thought that the premise and the policies of the labor laws are to encourage a wide variety of employer-employee agreements, both things that are listed in the labor laws, that are provided for in the labor laws, but many things that are not, that the idea is to get these parties together to reach agreements on a wide variety of things that matter to them, regardless whether the labor law specifically refers to them. Messenger. Well, the structure of the law is to encourage a wide variety of employer-employee    A and B are simply a bright-line gift ban, and then C provides the exceptions to it. And that sort of structure for a conflict of interest statute is relatively common. And so the common terms of collective bargaining agreements, either A, deliver nothing to the union itself, but give things to employees, such as wages, or in the alternative, if it does go to the union, it has to fall under one of the exceptions, and there's numerous. Sotomayor, why doesn't the billings, billing framework apply beautifully here? Messenger. Because what it holds is that where there's a regulatory framework, and here there is, that produces standards of conduct, going to Justice Kagan's point, that almost all of the three things that you're arguing against are standards of conduct that have been approved by the government, and when those conflict with a separate federal statute, then they're implicitly preempted, essentially. Why doesn't that doctrine do the work here? Messenger. Well, for two reasons. But the first and most important is that Section 302 is part of the labor law. It was enacted as part of the Taft-Hartley Act and amended as part of the Labor Management Reporting Disclosure Act. So you're not talking about two different statutory schemes as in billings, where you had the SEC law and you had the antitrust law. 302 is Federal labor law. It is every bit as much a Federal labor law as any provision of the National Labor Relations Act. Sotomayor, but we have conflicting provisions within single statutes anyway. So why doesn't the concept behind it still apply? The concept would if there was a direct conflict between the general prohibition of 302 and any right granted by the National Labor Relations Act. But importantly here, nothing gives Unite any right to the three things it demands from Mardi Gras. So enforcing 302 in this case cannot conflict with the NLRA. Unite has no right to information from Mardi Gras about its non-union employees, no right to use its properties, as this Court held in Lechmere, and certainly no right to control its communications, as 8c of the National Labor Relations Act says that even the NLRB can't control an employee's, an employer's communications absent a threat or promise of benefit. So there is no conflict here. And a persuasive opinion, although obviously not binding, is the Sixth Circuit's opinion in Mercy Memorial Hospital, where the Sixth Circuit, in that case, the general counsel of the NLRB said the employer's conduct does not violate the NLRA. And the union brought a 302 claim anyways, and the Sixth Circuit said it could bring that claim. 302 is meant to be independent of the National Labor Relations Act because they didn't give the NLRB any jurisdiction over it, and doesn't preempt. And they also added if it did preempt 302, 302 would be a dead letter. I mean, anything section 302 deals with will be covered by the NLRA somewhere. Breyer. Breyer. It's not covering. As I understand the argument, it goes back to like jurisprudence one. Can you have the sign says no vehicles in the park? Okay. Does that apply to a jeep used as a war memorial? Answer, no.  You spill blood in the streets of Bologna. A crime. But that's not applicable to the barber. All right? So here I think what they're saying is that, read this statute, you don't have to get into a metaphysical argument about things of value. Rather, those things which play a central role in the organizing campaign are things that are governed by the other parts of the NLRB, and to throw them in here, NLRA, and to throw them in here is going to create a mess. Lists, access, promises to stay neutral are central to many aspects of organizing campaigns, and they are no more within this statute, this part of the thing, than the jeep on the pedestal is part of the no vehicles in the park. Now, that's what I understand roughly their argument to be, if I've got it right. And what is your response? That nothing in the National Labor Relations Act gives them a right to that. I didn't say they had a right. They didn't say they had a right. What they said was the kinds of property or things of value at issue here are the kinds of things that play important roles in organizing campaigns. And we needn't go further than that. We don't have to talk about rights to it. We don't have to talk about who said what to whom. It's just that these kinds of things are organizing things, and therefore, they're outside the scope. It's like the jeep on the pedestal. But Section 302 was specifically amended in 1959 to apply to union organizing. They added Section 8A.2 to extend the prohibition to unions that seek to represent. Section 8A.3 applies to things given to employee committees to influence employees in their right to organize or bargain collectively through representatives of their own choosing. Scalia. And I suppose that would also follow if, with no indication in the text, you simply exclude organizing, the organizing part of labor law. I guess it would mean that the union can cut a deal with the employer, that if the union will promise not to seek a raise in wages or not to seek insurance coverage or whatever. I guess that would also be part of the organizing campaign, right? So it would be okay. Yes. An organizing exemption to Section 302 would tear a massive hole in the statute. It's difficult to think of anything that unions value more than an employer's assistance with unionizing foreign employees. Ginsburg. May I ask you, Mr. Messenger, to clarify, because I thought you told me before that some organizing agreements are okay. Are you taking the position that all organizing agreements, in other words, are you taking a position in opposition to what I read from the Eleventh Circuit, that organizing agreements can be valid? Yes, because the issue, I believe, with any agreement is each particular term has to be looked at individually. So, for example, if the issue was a particular term of a collective bargaining agreement illegal, the question wouldn't be phrased, are collective bargaining agreements legal? Same thing with organizing agreements. Every term is different. You do want us to say that to the extent that the Eleventh Circuit said employers and unions may set ground rules for an organizing campaign, even if the employer and union benefit from the agreement, you want us to say that that was wrong? Yes, because that, again, went back to its payment holding, and Mulhall's position is that the Court should overrule the lower court's decision that organizing assistance cannot be delivered. A list of information can, of course, be delivered. So, Mr. Messenger, just to make sure I understand that, you're saying that regardless  Let's just say that there was an employer. This employer said, you know, I think that my employees should have a right to listen to you and to decide for themselves whether they want to be represented by the union. So I'm inviting the union onto my premises. Just simple as that. You're saying that the employer cannot do that. That's correct. Consideration obviously can show value and it can show towards the purpose of the statute. But we don't need this. I mean, do you say that, of course, this is important to the union, so your argument is that it falls within the statute, regardless of whether there's any consideration or quid pro quo? Exactly. I'm sorry. I'm sorry. Exactly. Because 302 is structured not as a bribery statute that requires a quid pro quo. It's a gift ban. So this is to say that the National Labor Relations Act prohibits employers from providing access to their premises, from granting a union a list of employees, or from declaring itself neutral as to a union election. Yes, with caveats. With the first two, it could fall into exceptions and other circumstances. For, again, during a collective bargaining relationship, some of the exceptions start to apply to the information and use of property. And going towards the communications, if an employer unilaterally said, I'm not going to say anything, I don't have the time or money to fight the union, it can do so. But if an employer contractually agrees and gives the union control over its speech, then, yes, a thing of value is given. Do you acknowledge that your answer to Justice Kagan is contrary to years of settled practices and understandings? No, Your Honor. I don't believe that it is. And if this is going back to the courts, this kind of agreement is very rare. It's not rare now. It's only become prevalent in the 1990s to go to the courts. But it has been enforced under 301. So it would be odd to say that an agreement that is enforceable, that courts haven't enforced agreements just like this under 301, are criminal under 302. The exact opposite is true. Section 301 gives courts jurisdiction to enforce any agreement between a labor organization and an employer. 302 makes it illegal for an employer to agree to deliver something to a union. 302. Have courts enforced agreements just like this one under 301? Many times. However, 302 was not raised in those cases. So would they have enforced the agreement if it was alleged that it was violated 302? That, of course, is the question before this Court. The question is the same, I think. And to go back, I thought the most clear statement of your view was when you said to Justice Scalia that if we don't accept your interpretation, there's a hole in the statute. In fact, I think you said a big hole. All right. Now, even worse. I get the point. I'm focusing on the hole. Now, I thought the area that you're calling a hole is an area where the National Labor Relations Act gives to the National Labor Relations Board all kinds of authority to set rules and to say what is an appropriate practice and not. Am I right about that? To a degree, yes. But 302 always tells you it's not. All right. If the answer is yes, and I'm sure there's some qualification, but if the heart of the answer is yes, then it's the contrary that creates the hole. Because if we throw those things which are central to the NLRA's regulatory power into this particular provision, the NLRA loses the power to say when they're okay, when they're not okay, to make a thousand qualifications. Hence, the NLRA's regulatory provisions in this case are the jeep on the pedestal or the barber in the street, even though I have to tell you in Bologna in the 18th century, despite the exception of the 8th century, it did not mention barbers specifically in the statute. They had to be read in by the courts. The difference, Your Honor, I can't speak to Bologna, but 302 is meant to govern labor relations. Yes. Including organizing, including collective bargaining. So anything that the NLRB, what do you call it, has coverage over, 302 also covers it. So, for example. Mr. Messenger, suppose that there was a union and it was striking. And the union goes to the employer and they reach an agreement, and the agreement is the union will stop striking if the employer agrees to sit down and negotiate with the union. So that's the promise that the employer makes to the union. I'm going to sit down and negotiate with you. And that's obviously a thing of important value to the union. Is that also prohibitive? No, because in that case, there's no thing that's actually given to the union, especially if you're talking about negotiating a collective bargaining agreement, which, of course, those benefits go to employees. There's no thing that's given to the union? I mean, I would think if your argument is thing of value, is anything that's of value, there's nothing that's of greater value to the union than an employer's agreement to negotiate. But the question becomes negotiate what? So if the question is let's negotiate over employee wages, wages go to employees, there's nothing there. On the other hand, if it says we will negotiate over how much money we'll pay you to stop striking, well, then that's illegal under 302. So it just begs the question, or raises the question, I'm sorry, of what comes next after that. Kagan. Well, I guess, I mean, we're going to negotiate about all kinds of things, things that unions and employers negotiate about. And that's of great benefit to the union. The union gets to turn around to all its employees and say, look at this, the employer is going to sit down and talk with us. I would say in that case, even if it did have value, no thing is delivered to the union, because 302 doesn't. Scalia, benefits to the employees always benefit the union. I mean, that's, you know, that's automatic, it seems to me. I don't understand how you say that this is just a gift statute and there doesn't have to be anything on the other side, no quid pro quo. You say it's perfectly okay if the employer allows the union to come on his premises to recruit members, but it's not okay for him to agree to do so. No. I don't understand what that means. No, no, Your Honor. It would be illegal to agree or to do that. So if an employer didn't agree to allow the union on its property, just did, that would still be the delivery of the use of property. So that's not my position. And what if the employer does not oppose the union? He neither speaks against it nor for it. Is that giving something of value to the union? Not if he does so unilaterally. But if he agrees to do so, then the control is given to the union very similar to a noncompete. And the agreement or the agreement, the example I used in the brief, I believe, is a good one. If Coca-Cola decides not to run advertising against Pepsi, it hasn't given anything to Pepsi. They enter into a noncompete agreement. It has no meaning to say you agree to something when you're not getting anything in return. You can promise something without getting anything in return. To agree, I think that means, you know, I won't do it in exchange for something else. And there will be consideration. So the hypothetical given of the employer just doing it in exchange for nothing will almost never happen. As I believe Unite says in its brief, the employer But if it did happen, you'd say it would be a violation. Yes. So if the, for example, if the employer just said to the union, here's $1,000, just put it on the table, that's a violation. It doesn't have to go any further than that. Or if the union said, give me $1,000, that's illegal. The employer doesn't have to hand it over. But it's very unusual to have this kind of organizing agreement without a quid pro quo. Most employers don't hand over their employees to the union without something in exchange, either prenegotiated concessions at employee expense, such as an ad hoc, or an agreement not to strike, or a political campaign such as here. Sotomayor You would argue that the three items in dispute, the access to property, et cetera, that the consideration is the agreement to go into arbitration, presumably. Putting aside the $100,000, the interest arbitration or the arbitration of disputes that was promised by the employer and the union under this agreement. I wouldn't call that a consideration. I believe the consideration was what the union gave the employer was the $100,000 political campaign and the agreement not to strike. Sotomayor Not to strike, okay. Mr. Messenger Yes, not to strike. Kagan Mr. Messenger, would your argument apply to the following? I'm just going to give you a few kinds of different promises. A promise to give a union information about the company and its finances? Messenger During collective bargaining, no, because it would fall under the final clause of section C-2. Kagan But not if not during collective bargaining? Messenger Then if that had value to the union, yes. Kagan I'm sure it does. An agreement giving a union a role in grievance procedures? Messenger No, because the grievance procedures ultimately go to the employee. So a grievance over, for example, should this employee get back pay doesn't deliver anything to the union. Kagan Could you explain that distinction to me, ultimately go to the employee? I mean, I assume that everything that the union does, the union is saying, well, ultimately the benefits go to the employee. Messenger Well, but 302, its very structure sort of differentiates the union from the employee. So the thought of what's good for the union is good for the employee is somewhat rejected implicitly in 302, that there is a separation there. The union is supposed to act as their representative. Kagan But the union, on the ones that you say, well, the neutrality agreement, the access, that's just to the union, the union can turn around and say, no, ultimately it's to the employee, that we're going to represent the employee as well. I mean, so the line you're drawing seems quite inadministrable to me. Messenger I believe I didn't perhaps explain it correctly. It's not that if the union can say this is good for employees, that's exculpatory. The question is who gets the thing. So in other words, 302, this is a very literal interpretation, not mine, but just going back to the text. 302 requires payment or delivery. I'm sorry. Kagan And now, please. Messenger I'm sorry. Payment or delivery. So if the thing is delivered to the employee and not to the union itself, it's not covered. So for example, the original legislative history, they said what about wages to the employees? And the supporting senator said that. Kagan But my hypothetical was the thing was the union's role in grievance procedure. Messenger Grievance procedure. Kagan So the union gets it, right? Messenger No, because what – I don't believe that has any value intrinsically to the union. A grievance procedure is simply a contractual mechanism to do something else. Messenger So the question is what's – in other words, take arbitration. If you agreed to arbitrate something, what is – what are they arbitrating? If you're arbitrating over what the union gets, then yes, that could be illegal. But if you're arbitrating over what goes to employees, the thing is delivered to the employees. Kagan Well, I guess I'll tell you that I think that a union that can say that it has a role in grievance procedures is that's an important thing for a union to be able to tell its employees. That's of real value to the union to have that. Messenger But is the value coming from the employer? Like, there the argument would be the value is being given as the goodwill of employees towards the union. Kagan How about – how about the – if a company gives a union a role in company decision-making, any kind, hiring, any other kind of company decision-making? The company says we want the union to participate in this. Messenger I would say probably not, because what is – what is ultimately the thing? Is it if they gave it control, perhaps, over, like, you can now run the auto shop and, you know, take the profits from it, then yes. However, if it's merely we'll listen to your input, what exactly is being given? Because I think it's important here. Mulhall is not arguing for an expansive interpretation of 302. The three things that are actually at issue here are rather direct things given directly to the union, lists of information, use of property. So if you do move more to the fringes of things that may create indirect benefits to unions, that may create some problems and some difficulties. But the Court need not reach those here to find organizing assistance to violate the statute. Kennedy It's hard to think that one really pays or lends or delivers, which are the statutory words, neutrality of speech. Messenger It would be control. That's what's pled as you can deliver control over your communications to another. And that's done in gag clauses, which are common in litigation, of course, and also in non-compete agreements, which are intangible assets for tax purposes. So those can, that control can be delivered to another party or paid if it is done in consideration for something else. Kagan Mr. Messenger, the Excelsior rule, if I understand it correctly, the NLRB says that an employer absolutely has to give a list of employees to the union 7 days after an election is called. Is that correct? Messenger Not exactly. The employer has to give a list to the NLRB, and then the NLRB distributes it to all parties. Kagan So the union gets it 7 days after. Messenger Eventually, yes. Kagan And that's by requirement. So you are suggesting that if the employer gives it 6 days after, that's not only not required, that's forbidden. Messenger Yes. Kagan So it goes within a period of 24 hours, something that no employer can do voluntarily to something that has to be done. Messenger Yes. And the reason is, it's not the possession of the list that's somehow wrongful. It's the fact that it's given by the employer, which creates the danger, what will the union give in exchange? And that's the danger that 302 exists to take care of, not that it's necessarily wrongful per se for a union to have lists of information of use of property, but what will it do in return? And unions have compromised employee interest in exchange for this type of a system. They certainly have extorted employers. And here, Unite was willing to conduct a $100,000 political campaign for this information So, of course, in that hypothetical, they'd get it the next day anyway, so it would be rather unusual for it to happen. But in a case like this where the union can't even request an election, that list is extremely valuable to them. And as the Unite's conduct shows, they value it enough to do something in exchange for it. Ginsburg Is it we heard from the other side that that $100,000 payment for the ballot initiative was a benefit to both, because it would mean that there would be many more workers employed by the casino if they were allowed to go into this new line of business, so that it wasn't payment to the employer of something that is a benefit exclusively to the employer. It was to the union's benefit, too. Yes. I mean, that's probably – that may be true. However, 302 doesn't prohibit, as Mr. McCracken, opposing counsel said, prohibit a union from giving something to an employer. Thank you, Mr. Chaffetz. Thank you, counsel. Mr. McCracken, you have four minutes remaining. Thank you. Mr. McCracken, if I understood the circuit below, it was suggesting, like the government, that an exchange of agreements for purposes of peaceful recognition, terms that were given for that purpose were legal, but that things given for – that were not solely for recognition but had value outside of that, like money, would be wrong. That $100,000 is troubling to me, because I think what the circuit was saying is if the $100,000 bought the peaceful recognition provisions, then that's corrupt and that is outside the exemptions that the law provides. That's how I read its decision. Tell me why I'm wrong about that, and tell me how I deal with that niggling problem I have about the $100,000, because it does feel like a bribe to the employer. And the – reading the Eleventh Circuit's decision is actually somewhat difficult. I just – Because it appears that the Court suspected that there must be something else in the picture that had not been disclosed, and that's why it ordered the district court to find out why the two parties had cooperated with each other, despite the fact that no one had alleged anything else in the picture besides what is before us all now. The – so it seemed that the Court was puzzled that an employer would agree with the union to cooperate in this fashion.  Sotomayor was puzzled by the provisions at issue. I think it was puzzled by the $100,000. Yes. And the $100,000 was not a cash payment to anyone, although it might have been. It might have been a contribution to a political action committee that had been formed to advocate for this initiative. But instead, it was actually the union's own exercise of its speech and petition rights as it campaigned for the passage of the initiative that would allow the company to get into business in the first place as a casino. So if the violation turns on the union's exercise of its own First Amendment rights, then there's a more severe problem here than Section 302, I believe. Well, but there was a promise to exercise the First Amendment rights in a particular way up to the amount of $100,000. Yes. That's a little different. It's a little different, but also very similar to the promises that are actually on the face of the memorandum itself, because the union agrees to waive its First Amendment rights to engage in picketing and boycott activity, as well as the employer waiving some of its rights with respect to its freedom of speech. So this is a case where there are multiple waivers of rights, both speech rights and property rights, going back and forth between the two parties for a central, completely legitimate purpose, and that is the employer getting into business and the union getting the opportunity to organize its employees. That's all there is in this picture, is the union, like so many construction unions that we know, advocating in Congress for the passage of laws like the Keystone Pipeline Law. Why did they do that? They do it because they want the jobs. They hope that if they help the industry develop a pipeline, that their members will work on those jobs. That is a combination of interests funneled through the First Amendment's protection for mutual effort, as the Court recognized in Pennington. Of course, the Norr-Pennington Doctrine is one of our most important constitutional protections. That's all that happened in this case. So there's nothing nefarious about it. There are some extremely damaging things that the Respondent's very simplistic argument will accomplish, if it were adopted. Justice Kagan referred to the grievance procedure. Well, there's also arbitration in this agreement as well as in collective bargaining agreements, but one searches in vain in 302C for any exception for arbitration. Even though the Court has said over so many years that it is the most important thing under the Labor Management Relations Act. Thank you. Thank you, counsel. Counsel, the case is submitted.